Tomás Brito Vizcarrondo, demandante y apelante, *v.* Florentino López Pérez, demandado y apelado.

Núm. 7132.—*Sometido:* Febrero 6, 1936. *Resuelto:* Mayo 29, 1936.

*Ángel A. Vázquez,* abogado del apelante; *Damián Monserrat, Jr.* y *J. M. Calderón, Jr.,* abogados del apelado.

EL JUEZ PRESIDENTE SEÑOR DEL TORO, emitió la opinión del tribunal.

Se trata de un caso de *homestead* fallado en contra del demandante. Alegó éste en su demanda que teniendo en noviembre 29, 1926, establecido su hogar en cierta casa de su propiedad situada en Santurce, la hipotecó al demandado, y no habiendo pagado su deuda, el demandado se la cobró por la vía sumarísima, adjudicándosele la casa en mayo de 1934, siendo el demandante lanzado de ella con su familia por orden de la corte. Se reclaman quinientos dólares por concepto de hogar seguro.

Contestó el demandado negando que el demandante fuera jefe de familia y con ésta viviera en la casa en cuestión al hipotecarla y al ser lanzado de ella. Como defensas especiales alegó que la demanda no aducía hechos suficientes para constituir una causa de acción; que a la fecha de la constitución del gravamen ejecutado, el demandante no residía en la finca gravada; que al adjudicársele, la finca estaba debiendo $71.25 por contribuciones, suma que debe deducirse proporcionalmente del importe de la reclamación, y que la casa que se hipotecó fué destruída por el ciclón del 1932, habiendo entrado el demandado solamente en posesión del solar.

Fué el pleito a juicio y la corte lo resolvió en enero 31, 1935, en favor del demandado según consignó en su relación del caso y opinión, porque:

"Existe conflicto en la evidencia, conflicto que a nuestro juicio es irreconciliable, pero estudiada la evidencia en conjunto y dada la circunstancia de que la casa objeto de la hipoteca descansa en parte sobre el solar de la que dice el demandante pertenecía a su hermana, nos parece más digna de crédito la evidencia del demandado, y siendo ello así, tendríamos que llegar a la conclusión de que al tiempo de constituirse el gravamen hipotecario no existía el derecho de *homestead* siendo inmaterial que con posterioridad a la constitución de la hipoteca el demandante trasladase su residencia a la finca hipotecada."

Apeló el demandante. Su único señalamiento de error es el que sigue:

"La corte se excedió en el uso de su poder discrecional al dirimir en contra del demandante el pequeño conflicto existente entre la evidencia por éste aportada y la aducida por el demandado, y dictó, como consecuencia, una sentencia que infringe el quinto párrafo del artículo 162 de la Ley de Evidencia."

La evidencia documental no es contradictoria. Lo es en el extremo apuntado por la Corte sentenciadora, la testifical.

Declararon por el demandante, él mismo y Frank Laborda y Agustín Rivera.

Dijo el demandante:

"Soy jefe de familia y tengo familia que vive de mí; soy maestro constructor de obras, con más de 40 años de práctica y en el año 1906, en que era dueño del solar que se describe en la demanda de este pleito, construí dentro del mismo, personalmente y expresamente para yo vivirla con mi familia, la casa de dos plantas que con dicho solar hipotequé en el 1926 a don Florentino López Pérez: cuando constituí esa hipoteca yo vivía en esa casa: eso queda en Santurce, Calle Solá y una vez que terminé en el 1906 la construcción de esa casa, me instalé en seguida en ella a vivir con mi familia, en la planta alta, y dediqué los bajos a alquiler para comercio, rentándome esos bajos la suma de $40.00 mensuales: cuando me instalé con mi familia en la planta alta de esa casa, mi familia se componía

de mi esposa Luisa Ritz, mi hija Rafaela Brito, mi suegra Constancia Santel, mi hija de crianza Antonia Ritz, mi ahijado Narciso Beltrán, mi ahijada Ignacia Remigio, mi sobrina Lidia Figueroa y mi nieta Carmen María Valladares, todos los cuales eran mantenidos y sostenidos por mí y vivían y dependían de mí: después de trasladado a esa casa con mi familia en 1906, no me mudé para ninguna otra parte hasta que en 1932 tuve que abandonarla por algún tiempo y refugiarme en la casa de al lado, de mi hermana, que yo administraba y que ésta tenía a nombre mío, porque el ciclón de San Ciprián me la tumbó y la echó hacia un lado y yo la halé a su sitio cuanto pude y me metí dentro de ella con mi familia y la compuse quedando entonces de una sola planta y con tres habitaciones habitables, servicio sanitario, agua y se usaba el comedor como cocina, y quedamos viviendo todos allí conmigo y manteniéndolos yo, hasta que fuí lanzado de allí con mi familia por el Márshal de esta Corte en julio de 1934: actualmente la casa como está de una sola planta y su solar valen como $1,500.00: cuando en el 1926 constituí esa hipoteca la casa valía $4,000, yo no tenía otra finca. . .''

Declaró Laborda:

''Soy maestro constructor de obras, con 10 años más o menos de práctica: . . . . .

''La casa y solar objeto de este pleito están en Santurce, Calle Solá y tienen actualmente un valor de $1,000 ó $1,500: conozco a Tomás Brito el demandante hace 30 años, quien es también maestro constructor de obras y en el año 1906 construyó para él vivirla con su familia la casa aludida y una vez que la terminó se trasladó allí con su familia: la casa fué construída de dos plantas, en la alta se instaló Brito con su familia y la baja la alquiló para comercio: yo viví muy cerca de Tomás Brito en el año 1916, en que todavía continuaba viviendo la planta alta de la casa con su familia y aun cuando después me mudé para otro sitio de Santurce, siempre pasaba muy a menudo por la casa de Brito y lo ví viviendo constantemente allí hasta que en el 1932, con motivo del ciclón de San Ciprián que le tumbó la casa, entonces yo le dije que la levantara que podía arreglarla porque estaba en buenas condiciones y llevamos dicha casa a su sitio, arrastrándola y Brito se trasladó a una casa de al lado mientras componía la suya: la casa de Brito entonces quedó de una sola planta con las mismas dimensiones anteriores y tan pronto como terminó de componerla se trasladó a ella otra vez con su familia pues él no ha vivido otra casa y han estado viviendo allí constantemente

hasta que fué lanzado con su familia de la casa por el márshal en julio de 1934: en el año 1926 Tomás Brito vivía con su familia en la planta alta de esa casa, pues yo lo ví personalmente: Brito continúa siendo el jefe de su familia y los mantiene a todos: la casa como quedó después del ciclón no estaba en condiciones habitables.''

Y manifestó Rivera:

''Soy maestro constructor de obras con unos 14 años de práctica y la última obra que he construído es el edificio de concreto que queda detrás de la Clínica Miramar que costó más de $7,000: .... . conozco a Tomás Brito el demandante, que es también maestro constructor y quien construyó en Santurce, Calle Solá, la casa objeto de este pleito en el año 1906 para vivirla él y su familia: actualmente y cuando lo lanzaron, esa casa con su solar valdrán como $1,200 a $1,300: cuando en el año 1906 Brito terminó la construcción de esa casa, ésta era de dos plantas y él se mudó en seguida con su familia para la planta alta: la familia con quien Brito se trasladó a vivir la planta alta de su casa era su esposa e hijos: Brito era el jefe de esa familia y a todos ellos sostenía: Brito estuvo viviendo con su familia la planta alta de esa casa hasta el año 1932: el ciclón destruyó la planta baja y sacó fuera de su sitio la planta alta: yo ayudé a Brito a halar la casa para su sitio, porque cayó un poco más allá de su sitio cuando el ciclón: . . . entonces quedó de una sola planta y vivía allí mismo con su familia: en el año 1926 Brito vivía con su familia en la planta alta de la casa y eso lo sé porque yo iba a menudo a la casa: Brito no se mudó nunca de su casa desde el 1906 hasta el 1932 cuando el ciclón: en el año 1926 yo vivía en Santurce, en familia, en la casa del señor Brito de quien soy pariente y del cual dependía para mi sostenimiento.''

Por el demandado declararon él mismo, Francisco Berga, José Lázaro Costa y el Márshal Molina.

Dijo el demandado:

''Conozco al demandante con quien hice un contrato de hipoteca de la finca objeto de este pleito allá por noviembre del año 1926, por la suma de $2,000: algún tiempo antes de hacer el negocio de la hipoteca fuí a ver la casa acompañado de Francisco Berga, para ver si respondía a la cantidad que Brito quería en hipoteca, y era de dos plantas, la alta para vivienda y los bajos para comercio, que estaban alquilados a varios inquilinos y el piso alto tenía inquilinos también y Brito me manifestó que rentaba alrededor de $40 mensuales: . . .

cuando hice la hipoteca Brito no vivía en esa casa sino en una que era propiedad de él, contigua a esa: cuando yo hice la hipoteca la casa era de dos plantas, en buen estado de conservación y ahora son unos restos de una planta, que no están en condiciones habitables: entré en posesión de esa finca a mediados de julio de este año y estaba en las mismas condiciones en que está hoy o sea unos restos que habría que hacerlo todo y volver a construir allí porque las bases que tenía la finca construída están construídas sobre el solar colindante que era del señor Brito y hay que destruirlas: esos restos de casa cuando me los entregaron en julio no tenían instalación sanitaria ni de agua corriente: una de las plantas de la casa, la de altos, toda desvencijada, desnivelada y colocada sobre la base de la casa cuando era de dos plantas; le faltaban algunas puertas y ventanas, tenía otras sin embargo, cerradas con alfagías, sobre todo las de la parte de la calle.''

Declaró Berga:

''Soy administrador de fincas urbanas, conozco a don Florentino López Pérez hace alrededor de once años y lo conocía allá para el 1926: conozco de vista a Tomás Brito y recuerdo que allá para los primeros días del mes de septiembre el señor López me llamó que pensaba hacer una hipoteca con Brito y quería que yo le acompañase para que viera la propiedad como persona que conozco el negocio ese . . . y me llevó a la calle Solá en Tras Talleres núm. 6 y la vimos, estaba ocupada por inquilinos. Y me dijo 'yo voy a hacer una hipoteca y quiero que me des tu opinión' y yo ví la casa y ví que respondía con bastante garantía y más con los inquilinos que vivían allí y le dije: 'Mi opinión es que puedes dárselo'. Y más tarde lo encontré en la calle y le pregunté si hizo la operación y me dijo: 'Sí, se hizo': la casa que ví fué la de la Calle Solá, núm. 6, de madera, de una planta y tenía otra a la parte de atrás y yo no ví a Brito viviendo allí, yo ví inquilinos en toda la casa: yo creía que Brito vivía al lado en una casita de concreto que existe todavía allí: ahora recientemente, en el mes de julio de este año el señor López me mandó allá para ver en las condiciones en que estaba la casa para ver si se podía reconstruir y yo fuí y la ví en las condiciones que estaba porque está en unas condiciones que no se puede vivir, porque está en ruinas: estuve presente cuando el Márshal le entregó al señor López la finca: y la casa que entregó el Márshal no era la misma que ví en el 26 cuando se fué a hacer la hipoteca, pues estaba inhabitable, destrozada, sin puertas, que en las condiciones en que estaba no se

puede vivir allí, porque está amenazando ruinas: allí no vivía gente, ni había nadie: yo no ví a Brito viviendo en esa casa cuando fuí allí por primera vez, yo dije que vivían allí inquilinos y que creía que vivía en la casa de al lado.''

El juez preguntó al testigo: "¿Pero Ud. no estaba seguro que él viviera allí? Y el testigo respondió: "Ví familia de él allí y supongo que viviera allí y lo ví salir de aquella casa: cuando fuí con el Márshal no vivía nadie allí.''

Manifestó Lázaro Costa:

''Soy ingeniero civil desde hace 35 años; fuí requerido por don Florentino López Pérez para hacer una tasación de una finca de Santurce, en la Calle Solá y la tasación la hice hace cinco días; encontré una casa de madera que estaba arrancada de su base; hay una base de concreto y sobre esa base montada está una casa de madera que tiene una parte del techo; hay dos planchas de zinc arrancadas completamente; no tiene balcón; la casa tiene el seto donde estaba el balcón, pero no tiene balcón; parte del plafón del balcón arrancado también; en el interior, los tabiques interiores están fuera de su sitio, las puertas interiores están en el suelo; el piso cuando se pisa fuerte se mueve y los tabiques se mueven también. No tiene instalación sanitaria servible; hay un inodoro; no tiene caja ni tiene ventilación; los tubos están rotos. Hay restos de alumbrado o luz eléctrica y unos cuantos *switches;* esos *switches* están conectados en la pared: la casa no tiene agua: si fuera a reconstruirse la casa no está dentro de las leyes vigentes en Puerto Rico para las construcciones de casas y además la cuartonería tiene también carcoma, de manera que está en malas condiciones, así es que yo he tasado los materiales aprovechables que hay en esa casa como en ciento cincuenta pesos, eso aparte de lo que pueda valer el solar.''

Y el submárshal expresó:

''Fuí el funcionario que diligenció este mandamiento: estuve dos o tres veces a ver al señor Brito y a notificarle que esa finca había sido ejecutada y él se debía mudar: le dí un término y volví por allí y él me dijo que no se mudaba: en eso se vencieron los treinta días que yo tenía en el mandamiento original: la parte consiguió un nuevo mandamiento, volví a notificarlo y le dije: 'Bueno, se venció el término y no se ha mudado, pues lo mudaré yo,' y él me dijo: 'Ud. me tiene que matar Márshal porque yo no me mudo,': allí no

podía vivir gente, la casa es una que está en completo deterioro: allí había como algo de cocina, cama y eso no había: es una casa de dos plantas que se cayó, por la parte atrás no tenía ni puertas: realmente no era habitable: en condiciones de completo deterioro: el día que estuve allí para entregarle la finca al demandante estaba lo mismo, no se había hecho ninguna reparación ni se había hecho nada.''

Llamado nuevamente el demandante, declaró:

''La parte de esa casa que rentaba $40.00 era la planta baja, yo vivía en la planta alta: en la planta baja había negocio, comercio e inquilinos y nunca tuve inquilinos en la planta alta: cuando yo constituí la hipoteca no me había mudado en ningún momento de esa casa.''

Repetidamente esta corte ha resuelto que cuando el conflicto de la evidencia ha sido decidido por la corte sentenciadora, su decisión prevalecerá a no ser que se demuestre que actuó movida por pasión, prejuicio o parcialidad o que cometió error manifiesto.

Aquí no se alega pasión, prejuicio o parcialidad. Se sostiene, sin embargo, que existió error manifiesto y se invoca el artículo 524 del Código de Enjuiciamiento Civil, 162 de la Ley de Evidencia, en la parte del mismo que dice:

''En los casos civiles la afirmativa en una cuestión deberá probarse, y cuando la evidencia fuere contradictoria, la decisión deberá pronunciarse de acuerdo con la preponderancia de pruebas.''

y el 227 del propio código, tal como quedó enmendado en 1925, que expresa:

''En el juicio definitivo de cualquier caso en una corte de distrito, el juez de la misma, deberá hacer y archivar al mismo tiempo que dicte su sentencia una opinión escrita, que se unirá a aquélla, en la que expondrá separadamente y de una manera breve, los hechos que considere probados y las razones jurídicas en que funde su decisión. Cuando las resultancias de hecho se basaren en un conflicto de la evidencia, el juez expondrá los motivos que haya tenido para dirimir el conflicto en la forma en que lo hiciere; y en caso de apelación, el Tribunal Supremo deberá analizar dicha evidencia y determinar si las resultancias estuvieren justificadas o no.''

El punto esencial a resolver es el de si el demandante habitaba o no con su familia su casa cuando la hipotecó al demandado. Si la habitaba, su reclamación de hogar seguro es procedente. Si no la habitaba, carece de base.

La evidencia practicada se elevó a esta corte por medio de una exposición del caso tramitada de acuerdo con la ley. Casi íntegra la hemos transcrito. Sólo hemos omitido las repeticiones y algunas manifestaciones de los testigos que hemos considerado sin importancia. Tras un estudio concienzudo de la misma, nos vemos obligados a concluir que la corte cometió al apreciarla, el error manifiesto que señala el apelante.

De parte del demandante encontramos su propia declaración y las de los maestros de obras Laborda y Rivera, claras, completas, persuasivas. Frente a ellas sobre el extremo en controversia, las declaraciones del demandado y el testigo Berga. El demandado afirma que cuando hizo la hipoteca, ''Brito no vivía en esa casa sino en una que era propiedad de él, contigua a ésa.'' Berga se limita a decir que cuando fué con el demandante a inspeccionar la casa para cerciorarse de si valía lo suficiente para garantizar el préstamo que se estaba negociando, vió inquilinos en toda ella y que creía que Brito vivía al lado en una casita de concreto que existe allí todavía. Y cuando el juez insiste y al terminar su declaración le pregunta si estaba seguro, vuelve a contestar: ''Ví familia de él allí y supongo que viviera allí y lo ví salir de aquella casa.'' Nada afirma con certeza, quedando sólo un testimonio, el del propio demandado que contiene una afirmación escueta, hecha por una persona que seguramente no conocía la familia del demandante, que sólo le preocupaba que la casa fuera realmente de él y rentara lo suficiente. El hecho de si vivía o no el demandante con su familia los altos de la casa, no era algo que tuviera que llamar necesariamente su atención en aquella época, tratándose de persona que no se demuestra que estuviese versada en los tecnicismos de la ley.

A nuestro juicio es demasiado débil en verdad la evidencia del demandado para poder destruir la del demandante que ya dejamos calificada de clara, completa y persuasiva. La preponderancia de la prueba está en su favor y en tal virtud el conflicto debe resolverse y se resuelve en contra del demandado.

Bien poco tenemos que agregar. Todo jefe de familia que tenga familia tendrá derecho a una finca (*an estate*) de *homestead* hasta el valor de quinientos dólares en una estancia, plantación o predio de terreno y en los edificios contenidos en el mismo que le pertenezcan, dice la ley especial sobre la materia aprobada el 12 de marzo de 1903, (Comp. 1000). Y aquí el demandante dueño de un solar, construyó sobre él una casa de dos plantas y ocupó con la larga familia que de él dependía los altos y alquiló los bajos. Necesitando dinero, lo tomó a préstamo del demandado con la garantía de la casa y el solar. Luego el huracán de 1932 destrozó la casa y se refugió con su familia en la de su hermana que estaba al lado. Con la ayuda de sus amigos reparó lo mejor que pudo su antiguo hogar que quedó reducido a una planta y a él volvió con su familia tan pronto estuvo en condiciones de habitarse. No pagó la deuda que contrajo. Ejecutó la garantía el acreedor y en pago parcial de su crédito casa y solar se le adjudicaron y el demandante fué lanzado judicialmente de la finca en que tenía su hogar seguro.

A grandes rasgos son ésos los hechos que resultan de las alegaciones y las pruebas. El solar y la casa valían según la prueba del demandante al tiempo de la ejecución de mil a mil quinientos pesos. El perito del demandado se limitó a decir que los materiales aprovechables de la casa valían ciento cincuenta pesos, "eso aparte de lo que pueda valer el solar."

Hasta la suma de quinientos dólares, de acuerdo con la ley que hemos citado, estaba el hogar seguro del demandante "exento de embargo, sentencia, exacción o ejecución." Fué de él lanzado a gestión del acreedor y puesto éste en pose-

sión. Tiene, en tal virtud, de acuerdo con los hechos y la ley, derecho a que el demandado le pague los quinientos dólares que reclama.

*Debe declararse el recurso con lugar, revocarse la sentencia apelada y dictarse otra condenando al demandado a pagar al demandante quinientos dólares sin especial imposición de costas.*

El Juez Asociado Señor Wolf disintió.*

Los Jueces Asociados Señores Córdova Dávila y Travieso no intervinieron.